Argued and submitted August 25, 2010, reversed and remanded for reconsideration July 13, 2011

WY'EAST EDUCATION ASSOCIATION,
East County Bargaining Council,
and Oregon Education Association,
*Petitioners,*

*v.*

OREGON TRAIL SCHOOL DISTRICT NO. 46
and Employment Relations Board,
*Respondents.*

Employment Relations Board
UP1606; A140836

260 P3d 626

John S. Bishop argued the cause for petitioners. With him on the briefs were Elizabeth A. Joffe and McKanna Bishop Joffe & Arms, LLP.

Bruce A. Zagar argued the cause for respondent Oregon Trail School District No. 46. With him on the brief was Garrett Hemann Robertson P.C.

No appearance for respondent Employment Relations Board.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

ARMSTRONG, J.

**ARMSTRONG, J.**

Petitioners Wy'East Education Association, East County Bargaining Council, and Oregon Education Association (collectively referred to in this opinion as "the association") filed a complaint with the Employment Relations Board (ERB) alleging that respondent, Oregon Trail School District No. 46 (the district), had committed a variety of unfair labor practices in connection with a collective bargaining impasse and subsequent labor strike by represented district teachers in 2005. As relevant here, the association alleged that the district violated the Public Employees Collective Bargaining Act (PECBA)—specifically ORS 243.672(1)(a), (b), and (e) (set out below)—by improperly deducting health insurance premiums normally paid by the district from striking teachers' paychecks and by not allowing the association to directly reimburse the district for those amounts so that its members' paychecks would not be reduced. The association seeks judicial review of ERB's ruling in the district's favor with respect to those allegations.[1] ORS 183.482. We reverse and remand for reconsideration.

## I. BACKGROUND

We draw the facts from ERB's findings and the record. The district, a public employer operating a school district in Sandy, Oregon, and the association, a labor organization representing approximately 215 full-time and part-time teachers employed by the district, were parties to a collective bargaining agreement that expired in June 2004. After they reached an impasse in bargaining for a successor agreement, and the district unilaterally implemented its final contract offer, the association notified the district on October 14, 2005, that the teachers that it represented intended to go on strike on October 25, 2005. *See* ORS 243.712(2)(d); ORS 243.726(2)(c).

---

[1] The association also alleged violations of ORS 243.672(1)(a) based on the district's denial of contractual "other paid" leave and various conduct by district officials allegedly interfering with unit members' activity during the strike in retaliation for the exercise of their rights under PECBA. ERB found in favor of the district on the "other paid" leave issue and in favor of the association with respect to the remaining allegations. None of those rulings is at issue here.

On October 19, 2005, the district notified bargaining unit members that, if the strike occurred as announced and they did not return to work by November 7, they

> "will be ineligible to receive district fringe benefits for November (applied to December health coverage). If this occurs, employees will receive notice from the district and may self[-]pay premium balances to continue health insurance coverage."

The strike commenced as planned on October 25, 2005, and continued through November 16, 2005. On November 8, the district sent the association's members another written notice, stating, in part:

> "As communicated to you on October 19, 2005, those licensed staff [who] had not returned to work by 11/7/2005 would not earn district fringe benefits for November. By our records, you fall in the group that did not meet this requirement. In order to continue health insurance coverage, an amount equal to the premium due will be withheld from your November payroll check. This amount will then be applied to pay your December premium (October benefit was used to pay your November premium)."

On November 10, counsel for the association wrote to the district's business manager, informing him that the Oregon Education Association (OEA) intended to "make direct payment of any unpaid health insurance premiums on behalf of striking teachers which are necessary to guarantee that the teachers will have continued coverage during the ongoing strike" and requesting information about how to make those payments. The district did not respond until November 14, 2005, when the business manager notified the association that it had already made arrangements to deduct premiums from employees' paychecks but would provide the association with information to allow it to reimburse its members individually. On November 23, 2005, OEA issued checks directly to the teachers to reimburse them for the premiums that the district had deducted from their paychecks.

Article 32 of the parties' 2001-04 collective bargaining agreement governed fringe benefits. As to the first year of the contract, the agreement provided:

"The District shall pay the full premium for each employee and for all enrolled dependents for the current medical/vision plan, dental plan, and orthodontia coverage or provide substantially equivalent coverage."

The agreement further provided that, in the second year of the contract, "[t]here will be a maximum district contribution cap of up to $600 per full time teacher per month per insurance year," and that, if the amount paid by the district for the premiums was less than the actual cost, "then each affected employee shall pay the difference through payroll deduction." The agreement increased the maximum district contribution to $680 for the third year of the contract and retained the language allowing payroll deductions to make up any difference in cost; the district's implemented final offer again increased the insurance contribution—to a maximum amount of $720 per month for the 2005-06 school year. The contract did not define when an employee becomes eligible for insurance premium contributions. The only mention of prorated district contributions toward insurance benefits was in reference to part-time employees.

As a result of the events described above, the association filed an unfair labor practice complaint against the district alleging that the fringe benefit deductions and the way in which the district made those deductions violated ORS 243.672(1)(a), (b), and (e).[2] As a defense to the complaint, the district asserted that its processing of insurance contributions during the strike was in accordance with its "normal business practices," which, according to the district, required an employee to work more than half the work days in a pay period in order to be eligible for district-paid insurance benefits for that pay period. Before the hearing on the complaint,

---

[2] The association's original complaint was limited to allegations that that conduct violated ORS 243.672(1)(a) and (b). At the start of the ERB hearing, however, the association moved to amend its complaint to include allegations that the district's conduct also violated ORS 243.672(1)(e). The administrative law judge (ALJ) eventually denied the motion in his proposed order. ERB concluded that the ALJ should have allowed the motion to amend but the error was not prejudicial because the parties had been told that subsection (e) was an issue for the hearing and they had presented evidence and argument regarding it at the hearing and in their post-hearing briefs.

the association served the district with a subpoena *duces tecum*, requesting documentation of that practice. The district moved to quash the subpoena, in part, because it was "unduly burdensome and costly." The administrative law judge (ALJ) denied the district's motion but ruled that the association was required to pay the district's costs to comply with the subpoena. The association elected not to pay those costs, and, consequently, the information was not produced.

ERB subsequently ruled that the ALJ had correctly denied the motion to quash but had erred in requiring the association to pay the district's costs to comply with the subpoena. ERB found that, because the subpoena "did nothing more than require the District to produce the documents needed to prove its own defense," its "unexplained failure to produce evidence in support of its position warrants an inference that the documents would have been unfavorable to the District." That negative inference, ERB concluded, would render harmless the ALJ's error.

ERB also found, however, that,

"[b]etween 1996 and 2004, the District notified three Association bargaining unit members that because they would be in paid status for one-half or fewer of the days in a pay period, they would lose District-paid fringe benefits for the next pay period. One bargaining unit member chose to self-pay fringe benefit costs, another elected to drop District insurance coverage, and the third person changed the dates of her planned leave to avoid any loss in benefits.

"The practice used on these three occasions was not written down in any document. The parties never addressed it at the bargaining table or in other discussions between the parties prior to this labor dispute. Association officials were unaware of this practice."

(Footnote omitted.)

ERB ultimately ruled in the district's favor on the association's allegations that the district's conduct had violated ORS 243.672(1)(a), (b), and (e), and the association assigns error to each of those rulings. We discuss each in turn.

## II. ANALYSIS

### A. *Violation of ORS 243.672(1)(e).*

We begin with the association's challenge to ERB's dismissal of its claim that the district violated ORS 243.672(1)(e). Under that provision, it is "an unfair labor practice for a public employer or its designated representative" to "[r]efuse to bargain collectively in good faith with the exclusive representative." The duty to bargain in good faith includes refraining from making a unilateral change to the status quo of the parties' employment relations after a contract has expired. *Oregon State Police Officers' Assn. v. State of Oregon*, 240 Or App 419, 424, 246 P3d 97 (2011) ("We have consistently held that '[a] unilateral action on a mandatory subject of bargaining during negotiations is a violation of the duty to bargain in good faith.' " (Quoting *Gresham Tchrs. v. Gresham Gr. Sch.*, 52 Or App 881, 889, 630 P2d 1304 (1981); brackets in *Oregon State Police Officers' Assn.*)).[3]

> "To determine whether a change to the status quo has occurred, ERB compares the new provision to either the existing collective bargaining agreement or, if that agreement does not address the disputed issue with sufficient clarity, to past practice. If the asserted change takes place after a collective bargaining agreement has expired but before a successor agreement is in place, then, because an employer has an obligation to preserve the status quo in the interim period, *see* ORS 243.712(2)(d), the terms of the expired agreement or the practice in place during its existence remains the status quo benchmark."

*Lincoln Cty. Ed. Assn. v. Lincoln City Sch. Dist.*, 187 Or App 92, 96, 67 P3d 951 (2003). Thus, ERB must answer two questions: First, what was the status quo? And, second, did the employer unilaterally change it? *Bend Firefighters*

---

[3] The parties do not dispute that health insurance benefits are a mandatory subject of bargaining in this case. *See* ORS 243.650(4) (defining "collective bargaining" to mean the performance of the mutual obligation of a public employer and employee representative to meet and confer in good faith with respect to employment relations); ORS 243.650(7)(a) (" 'Employment relations' includes, but is not limited to, matters concerning direct or indirect monetary benefits, hours, vacations, sick leave, grievance procedures and other conditions of employment."); *Service Employees Int'l Union Local 503 v. DAS*, 183 Or App 594, 598, 54 P3d 1043 (2002) (recognizing that employee health insurance is an "indirect monetary benefit").

*Association v. City of Bend*, 16 PECBR 378, 381 (1996). The burden is on the party claiming that the status quo was violated to prove the existence of the past practice establishing the status quo. *AFSCME Local 88 v. Multnomah County*, 22 PECBR 279, 285, *adh'd to as modified on recons*, 22 PECBR 444 (2008); ORS 183.450(2) ("The burden of presenting evidence to support a fact or position in a contested case rests on the proponent of the fact or position.").

In this case, ERB understood the association to be arguing that, based on past practice, the status quo before the strike was that "teachers who were in paid status for less than a full pay period paid *a prorated share* of their fringe benefit premium costs if they wished to continue coverage" and, therefore, that the district had unilaterally changed the status quo by instead deducting the *full amount* of the monthly premium costs from the paychecks of striking workers. (Emphasis added.) Analyzing *that* question, ERB found that "[t]he Association has not shown a long-standing, consistent District practice of requiring a teacher to pay a prorated share of the teacher's health insurance premium costs if the teacher was in paid status for less than a full pay period." ERB reasoned:

> "The expired contract does not address this subject, and the District has no written policy or rule regarding this matter. The Association relies on past practice to establish the *status quo*. A past practice must be clear, consistent, and repeated over a long period of time. The record demonstrates no consistent past practice in regard to the amount that teachers were required to pay for insurance premiums if they were in paid status for less than a full pay period. To the contrary, the practice is mixed. Based on the District's failure to produce payroll records, evidence it would naturally wish to produce if it was favorable to the District's position, we have inferred that this evidence supports the Association's position: that the District prorated fringe benefit premium costs for teachers who were in paid status for less than a full pay period. However, actual examples in the record are contrary to this inference. On three occasions between 1996 and 2004, the District warned teachers that they would lose District-paid fringe benefits for a full pay period if they did not remain in paid status for more than one-half of the days in the preceding pay period."

(Internal citation omitted.) Consequently, ERB concluded:

> *"Because the Association has failed to establish that District proration of fringe benefit premium costs was the status quo,* we do not find that the District unlawfully changed it in violation of subsection (1)(e) when it required bargaining unit members to pay the full monthly cost of their premiums in November. We will dismiss this allegation."

(Emphasis added.)

On judicial review, the association argues that ERB's decision is unsupported by substantial evidence or substantial reason and is wrong as a matter of law. According to the association, the basis for its complaint was *not* that the district had a past practice of prorating employee fringe benefit premiums based on the number of days an employee was in paid status during the pay period. That is, the association never contended that the status quo was to prorate the amount of insurance premiums paid by the district for employees in those circumstances and to deduct the remainder from the employees' paychecks. Rather, the association insists that its argument throughout the proceedings below was that

> "the District had no authority under any prior relations between the parties to deduct *any* amount of District-paid insurance premiums—let alone a pro-rated amount—from employee paychecks, based on the employees' failure to work for some specified period."

(Emphasis in original.) In other words, according to the association, its argument asserted that the district had changed the status quo by implementing a new practice that did not exist before (eliminating district-paid insurance premiums for employees in paid status who work half or fewer of the work days in a pay period), not that the district had changed an existing practice (prorating district-paid fringe benefit payments based on days in paid status) to that new practice. Consequently, in the association's view, it "had only to prove that the District's alleged practice never existed before," not that the district had "some other practice" that it had changed, and ERB thus erred in rejecting its claim for failing to prove the latter.

As explained below, we agree with the association that ERB misapprehended the premise underlying the association's ORS 243.672(1)(e) claim; it follows that ERB's conclusion rejecting that claim is therefore not based on substantial reason. *See generally* ORS 183.482(8)(c). Accordingly, we reverse ERB's dismissal of the association's claim under ORS 243.672(1)(e) and remand for reconsideration.

The association's amended complaint included the following allegations in support of its claim that the district's actions had violated ORS 243.672(1)(e):

"27.   Both the District's Implemented Final Offer and the parties' expired collective bargaining agreement provided that the District would pay either the full premium or a maximum contribution toward a full premium for each full time teacher 'per month per insurance year.' [T]he District's Implemented Final Offer and the parties' expired collective bargaining agreement also provided that the District would pay for part-time employees a 'pro rata contribution towards the regular District cost of insurance based upon the relationship their regularly scheduled work hours bear to those of full time employees.'

"28.   Neither the District's Implemented Final Offer nor the parties' expired collective bargaining agreement provided either directly or implicitly that the District could withhold payment of an *entire* month's fringe benefit premium based on the fact that the employee did not work for all days during the month when the premium became due. Nor did either document provide either directly or indirectly that the District could withhold the pro rata contribution towards insurance that would normally be paid on behalf of a part-time employee based on the fact that the part-time employee did not work all days during the month when the contribution became due.

"29. The District's deduction of [an] *entire* month's worth of fringe benefit premiums from the salary of all bargaining unit employees upon their return to work following the strike constituted a unilateral change and failure to maintain the status quo in violation of the District's duty to bargain in good faith under ORS 243.672(1)(e)."

(Emphasis added; underscoring omitted.) The district apparently relies on the association's references to the district's

deduction of an *"entire"* month's benefit premium as reflecting the association's argument—correctly understood by ERB, in the district's view—that to maintain the status quo, the district should have deducted from striking employees' paychecks only a *prorated* amount of the monthly fringe benefit premium normally paid by the district.

However, the context of the complaint does not support the district's position. Nowhere in the complaint does the association assert an existing district practice of prorating insurance premium payments to employees based on the number of days in paid status. Moreover, in its request for relief, the association sought, *inter alia*:

> "An order requiring the District to reimburse the OEA *for all amounts* that the OEA paid directly to District employees to prevent those employees from suffering losses in salary due to the District's unilateral and improper deductions from the employees' paychecks taken to pay for the employees' November 2005 fringe benefit premiums."

(Emphasis added.) Thus, the complaint requests full—not partial or prorated—reimbursement of the amounts that the association paid employees to make up for the insurance premiums deducted from their paychecks. In short, the complaint can only be understood as alleging as the status quo the payment of fringe benefit premiums without regard to the number of days in paid status during the relevant pay period.

Similarly, in opening argument before the ALJ, counsel for the association argued:

> "[O]ur amended complaint suggests that even if it was not retaliatory, even if the district can somehow contend that it had no motivation to harm the employees, our contention is that there's no evidence that the status quo, *the past practice of these parties allowed the district to deduct an entire month's pay—premium payments from employees' paychecks when the employees had actually worked during that month.*
>
> "And the evidence is that these employees returned to work on November 17th, which was the middle of the month, approximately, and they did work days in November. And the district's essentially saying that, even

though you worked in the month of November you are enti-
tled to absolutely no contribution or [*sic*] health insurance
premiums, fringe benefit premiums, and our contention is
that that's unprecedented in the practices of this employer."

(Emphasis added.)

Significantly, the association reiterated that posi-
tion in its post-hearing brief:

"There is nothing * * * in the parties' expired contract or
in the district's written implemented final offer which says
anything about employees having to work a designated
period of time in a designated 'payroll period' in order to
'earn' district paid insurance contributions for a given
month of the contract year. Moreover, nothing in those doc-
uments states or even implies that the district would be
entitled to withhold the 'full premium for each employee' in
a given month if the employee failed to satisfy such a
condition."

(Emphasis omitted.) It further argued that there was no evi-
dence showing that the district "had any written rule or pol-
icy that created a *status quo* allowing it to unilaterally
deduct[ ] money from employee paychecks if the employees
failed to work enough to somehow 'earn' district paid bene-
fits." The association concluded:

"In sum, there is no evidence in the parties' expired con-
tracts, the district's implemented final offer, the parties'
bargaining history, the district's work rules or policies, or
any of the parties' past practices to support the district's
assertion that the *status quo* permitted it to require
employees to fulfill certain conditions to 'earn' monthly
insurance premiums or to deduct from employee paychecks
if they did not 'earn' their benefits by fulfilling such
conditions."

Thus, the association's underlying theory remained
essentially consistent—*viz.*, that the status quo did not per-
mit the district to withhold any amount of the monthly fringe
benefit payments based on an employee's failure to work a
specified number of days in the pay period and, thus, that the
district's unilateral implementation of that practice following
the strike was a violation of ORS 243.672(1)(e).[4]

---

[4] It was not until its reply brief before this court that the association made the
qualitatively different argument that the expired collective bargaining agreement

As evidence supporting ERB's contrary understanding, the district points only to two November 22, 2005, letters written by the association's counsel to the district business manager, in which counsel asserted, first, that "[i]t seems clear that the District will be obligated to pay at least a portion of the 'fringe amounts' it normally pays for licensed employees for the month of November,"[5] and, in the second letter, that the association "adamantly disagrees with the District's unilateral conclusion that employees owe the entire amount of their monthly fringe benefit premiums for the past pay cycle." We do not agree that those communications, written in the midst of discussions between the parties regarding the association's efforts to pay any unpaid health insurance premiums on behalf of its members, are sufficient somehow to transform the legal theory advanced by the association in its pleadings and post-hearing brief. Rather, in context, it appears, as the association contends, that counsel's statements were suggestions for resolving the dispute between the parties about the provision of insurance benefits during the strike and were intended "merely to underscore the unfairness of the District's unilateral deduction of a full month of benefits from employees who had been on strike for far fewer days." (Emphasis omitted.) Indeed, in the first of those letters, counsel made clear that OEA's willingness to reimburse employees for amounts deducted by the district for insurance benefits was "not intended to indicate that it agrees * * * that the District even has the right to make such deductions unilaterally."

In sum, it is apparent that ERB incorrectly characterized the association's claim as asserting that, to maintain the status quo, the district should have deducted from striking employees' paychecks a prorated amount of the costs of the monthly insurance benefit premiums normally paid by

directly addressed the subject by *requiring* the payment of the full premium and, thus, that ERB had erred in even considering past practice. ERB never had an opportunity to address that question, and, hence, we do not address it either.

[5] This letter is also described in the factual allegations of the association's complaint. That allegation states, in part, "Council's lawyer pointed out that it seemed clear that the District would have to pay for some portion of the fringe amounts it normally paid for licensed staff, since the strike lasted for just slightly more than half of November."

the district, rather than the full amount.[6] ERB then reasoned from that erroneous premise to the conclusion that the association failed to satisfy its burden of proving that the district had violated the status quo. As a result, ERB's conclusion is not supported by substantial reason, and we reverse and remand for ERB to consider in the first instance whether the association carried its burden of proof under a proper characterization of its claim. *See Portland Assn. Teachers v. Mult. Sch. Dist. No. 1*, 171 Or App 616, 627, 16 P3d 1189 (2000) (in reviewing for substantial reason, "we review ERB's reasoning for whether ERB correctly applied legal principles in the individual case before it").[7]

## B. *Violation of ORS 243.672(1)(a).*

In its second assignment of error, the association asserts that ERB also erred in dismissing its claim under ORS 243.672(1)(a). As explained below, ERB's ruling suffers from the same flaw as its resolution of the association's ORS 243.672(1)(e) claim discussed above—*viz.*, it is based on a fundamental misunderstanding of the association's claim

---

[6] It is possible that the confusion arose as a result of *the district's* characterization of the *association's* position during opening arguments before the ALJ. Specifically, counsel for the district plainly stated during his opening argument, "The union argues that the district should have deducted only a prorated share for the number of days of the strike." However, we do not agree that the district's characterization of the association's argument defeats the clear statements in the association's own pleadings, including, as described above, those in its post-hearing brief, which, of course, was submitted after that statement was made. ERB erred in accepting the district's characterization.

[7] We reject the association's assertion that this court "can reach the conclusions that * * * ERB should have reached, as a matter of law, based on the facts and inferences [ERB] declared, and despite [ERB's] misinterpretation of the Association's views on the *status quo* prior to the strike." We likewise reject the district's contention that, even if ERB misunderstood the association's status quo argument, we can nonetheless affirm ERB because "what [the alleged] past practice may be or may not be is of no consequence because * * * ERB does not find evidence of any past practice and, in order to determine if ORS 243.672(1)(e) is violated, the past practice must first be identified." (Boldface omitted.) Those arguments should be addressed in the first instance by ERB, particularly in light of the remand required by our resolution of the association's second assignment of error. *Cf. Portland Assn. Teachers*, 171 Or App at 645 ("[A]n intelligent exercise of our appellate powers compels us to ask for the elimination of obscurities and ambiguities on the conclusions and reasoning fundamental to the resolution of the issues in this case." (Footnote omitted.)).

and that misunderstanding necessarily undermines its reasoning.

Under ORS 243.672(1)(a), it is an unfair labor practice for a public employer to "[i]nterfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662."[8] Subsection (1)(a) contains two prohibitions: "(1) restraint, interference, or coercion 'because of' the exercise of protected rights; and (2) restraint, interference, or coercion 'in' the exercise of protected rights." *Portland Assn. Teachers*, 171 Or App at 623. In a claim based on the "because of" prohibition, motive is an element. Hence, to succeed on such a claim, a complainant "must establish that the employer was motivated by the exercise of the protected right to take the disputed action." *Id.* (emphasis omitted). In other words, there must be "a direct causal nexus between the protected activity and the employer's action"; it is not necessary to show "anti-union animus or other hostility" toward the exercise of the right. *Id.* at 623 n 3.

> "The ultimate issue of whether an employer acted coercively and was motivated to do so by the exercise of protected activity is a factual determination, one that ERB must make considering the nature of the action taken and the circumstances in which it was taken. In testing whether the record supports ERB's resolution of that issue, we review for whether ERB has correctly identified the applicable legal principles; we further review for substantial evidence and for substantial reason."

*Id.* at 626-27.

With respect to claims based on the "in" prong, on the other hand, the question is not one of motive, but one of consequences: "[T]he essential issue is only whether, objectively viewed, the action that the employer took under the particular circumstances would chill union members generally in their exercise of protected rights." *Id.* at 624.

---

[8] ORS 243.662 includes the right to "participate in the activities of labor organizations * * * for the purpose of representation and collective bargaining * * * on matters concerning employment relations."

In this case, the association's complaint encompasses both the "because of" and "in" prongs of a subsection (1)(a) claim. Specifically, the association contended that

> "[t]he District's decision to deduct fringe benefit premiums from employee paychecks and to spurn OEA offers of direct reimbursement to prevent such deductions interfered with employees in and because of the exercise of their rights protected by ORS 243.662."[9]

ERB's error in mischaracterizing the basis for the association's claim, however, again undermines its reasoning. Regarding the "because of" claim, ERB described the association's theory as follows:

> "The Association contends that the District refused to use the fairest method of dealing with the absence resulting from the strike—*requiring teachers to pay a prorated share of their fringe benefit premium costs*—because it was angry about the strike. According to the Association, the District deducted the cost of an entire month's fringe benefit premiums 'because of' the teachers' participation in a lawful strike, an activity protected under the PECBA."[10]

(Emphasis added.) With the issue thus framed, ERB reasoned that the district's actions in deducting the premiums did not violate the "because of" prong of subsection (1)(a) because, on the date (October 19, 2005) that it notified district teachers about the consequences that the strike would have on their health insurance premiums, the district did not know whether its choice to apply the method that it did— deducting the entire monthly premium amount—rather than the alternative—prorating—would help or hurt teachers. As

---

[9] The association does not challenge ERB's ruling that the district's refusal to accept the association's offer to reimburse the district for the costs of its members' fringe benefit premiums did not violate ORS 243.672(1)(a). Hence, we do not address that issue.

[10] ERB found that, before the strike, the district used two methods of calculating health insurance premium costs for teachers who were in unpaid status for some portion of the pay period: The first, as established by the three examples in the record, required teachers to pay the cost of an entire month's premium if they were in unpaid status for one-half or more of the days; the second, as established by the "negative inference" that ERB derived from the district's failure to comply with the subpoena, *see* 244 Or App at 199, prorated premium costs and required teachers to pay a portion of the costs based on the number of days they were in unpaid status. The negative inference, of course, would have different implications under a proper characterization of the association's claim.

ERB explained, because of the timing of the pay period, under the district's method,

> "[i]f the planned strike lasted 9 days or [fewer], bargaining unit members would have paid *no* fringe benefit premium costs. Had this occurred, they would have been in a better position than if the District had adopted the method advocated by the Association—prorating premium costs. If the planned strike lasted 10 days or more, then bargaining unit members would have to pay the costs of their monthly fringe benefit premiums."

(Emphasis in original.) Consequently, ERB concluded, the approach to payment that the district adopted was "neutral on its face."

Thus, as with the subsection (1)(e) claim, ERB's rationale for dismissing the association's subsection (1)(a) claim is predicated on its mischaracterization of the basis for that claim—*viz.*, that the district had violated the statute based on its choice to deduct the entire monthly fringe benefit premiums from employees' paychecks *rather than* prorating the deduction. However, as discussed above, the association's complaint was targeted, not at the district's failure to prorate the premiums, but at its withholding of any amount of the premiums. ERB's reasoning—that the district's action was not motivated by the employees' exercise of their protected right to strike because it could not have known which method—as between the two—would adversely affect the striking workers—is thus inapposite. In other words, ERB made no finding on the pivotal question presented by the association's claim: whether, in deducting *any* fringe benefit premiums from employees' paychecks, the district was motivated by the employees' exercise of their right to strike. Accordingly, we remand for ERB to consider that question. Moreover, because ERB explicitly and necessarily relied on its "because of" analysis to resolve the association's claim under the "in" prong of the statute,[11] on remand, ERB must also address that issue.

---

[11] ERB first found that there necessarily was no derivative violation of the "in" prong of the statute because of its previous finding that the "because of" prong was not violated. *See OPEU and Termine v. Malhuer County*, 10 PECBR 514, 521 (1988) ("Employer discrimination which is caused by an employee's union activity will inevitably have the *effect* of interfering with the employee's exercise of

## C.  *Violation of ORS 243.672(1)(b).*

In its final assignment of error, the association challenges ERB's dismissal of its claim under ORS 243.672(1)(b), which provides that it is an unfair labor practice for a public employer to "[d]ominate, interfere with or assist in the formation, existence or administration of any employee organization." Our resolution of the association's first assignment of error compels a remand on this claim as well.

The association claimed that the district committed an unfair labor practice under ORS 243.672(1)(b) by (1) deducting the cost of monthly health insurance premiums from employees' salaries, and (2) arbitrarily refusing the association's offer to reimburse it for those costs.

With regard to the first of those contentions—the district's deduction of the costs of health insurance premiums itself—ERB found that the association had

> "failed to demonstrate that the District's actions actually and adversely affected its ability to represent its members. Although the Association alleges that the District's requirement that teachers pay monthly fringe premium costs caused members to doubt the Association's ability to represent its members, its claims were purely speculative since it presented no evidence in support of this contention. *In addition, we have found that the District's choice to require each bargaining unit member to pay the cost of an entire month's fringe benefit premium was lawful and based on legitimate considerations.* Accordingly, the District's action did not violate subsection (1)(b)."

(Emphasis added.)

ERB separately addressed the association's contention that the district's refusal to accept the association's payment for the fringe benefit costs was also a violation of subsection (1)(b). Again, ERB found that the association had

---

protected rights." (Emphasis in original.)). ERB also found no independent violation of the "in" prong, stating only, "*As we have discussed above*, a lawful employer action does not have the natural and probable effect of discouraging bargaining unit members from exercising their PECBA-protected rights." (Emphasis added.) ERB, however, did not analyze the lawfulness of the specific action challenged by the association—that is, deducting *any* amount of fringe benefit payments from employees' paychecks.

failed to provide proof of "any actual loss of confidence in the Association that resulted from the District's conduct" in that regard; it further found that "the District had valid reasons for refusing the Association's offer of payment."

On review, the association challenges only the former—that is, ERB's conclusion that the district did not violate subsection (1)(b) by deducting the costs of the premiums.[12] It argues, *inter alia*, that ERB's ruling cannot stand because it is predicated on ERB's erroneous conclusion that the district's decision to deduct employee fringe benefit premiums from employee paychecks was "lawful and based on legitimate considerations." We agree with the association as to this dispositive point: Because ERB's decision that the district did not violate subsection (1)(b) is dependent, at least in part, on its previous finding that the district's action in deducting the health insurance premiums from employees' paychecks was lawful—a finding that we have determined must be revisited in light of ERB's mischaracterization of the association's claim, *see* 244 Or App at 207, 210 n 11—ERB's decision was not based on substantial reason. Accordingly, we also reverse and remand ERB's dismissal of the association's subsection (1)(b) claim for reconsideration.

Reversed and remanded for reconsideration.

---

[12] The association did not challenge ERB's ruling with respect to the district's refusal of its offer of reimbursement for the costs of the insurance premiums in its assignment of error and made no argument concerning that error in its opening brief; rather the issue was first presented in its reply brief. Thus, we do not consider it. *Clinical Research Institute v. Kemper Ins. Co.*, 191 Or App 595, 608, 84 P3d 147 (2004) ("We generally will not consider a basis as to why the trial court erred that was not assigned as error in the opening brief but was raised for the first time by way of reply brief." (citing *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 380-81, 823 P2d 956 (1991); ORAP 5.45(1))).