Filed: December 8, 2011

IN THE SUPREME COURT OF THE STATE OF OREGON

FRED GIROD,
ROD MONROE, DAVID SCHAMP, CARY JOHNSON,
HOBART B. KYTR, and STEVEN ERNEST FICK,

Petitioners,

v.

JOHN R. KROGER,
Attorney General,
State of Oregon,

Respondent.

(SC S059713)

En Banc

On petitions to review ballot title filed September 8, 2011, considered and under advisement on November 2, 2011.

Gregory A. Chaimov, Davis Wright Tremaine LLP, Portland, filed the petition and reply memorandum for petitioners Girod, Monroe, and Schamp.

James M. Brown, Portland, filed the petition and reply memorandum for petitioner Johnson.

Hobart B. Kytr, *pro se*, filed the petition and reply memorandum for himself.

Thomas V. Dulcich and Sara Kobak, Schwabe, Williamson & Wyatt P.C., Portland, filed the petition and reply memorandum for petitioner Fick.

Jeff J. Payne, Assistant Attorney General, Salem, filed the answering memorandum for respondent. With him on the memorandum were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Robert C. Lothrop and John C. Platt, Portland, filed the brief for *amicus curiae* Columbia River Inter-Tribal Fish Commission.

LANDAU, J.

The ballot title is referred to the Attorney General for modification.

LANDAU, J.

Petitioners seek review of the Attorney General's certified ballot title for Initiative Petition 21 (2012), arguing that the ballot title does not satisfy the requirements of ORS 250.035(2). We review a certified ballot title to determine whether it substantially complies with those statutory requirements. *See* ORS 250.085(5) (stating standard of review). For the reasons that follow, we refer the ballot title to the Attorney General for modification.

Initiative Petition 21 would amend a number of statutory provisions pertaining to the commercial harvest and sale of salmon from the Oregon portion of the Columbia River. Because those statutes exist as part of a complex web of laws that govern fishing in the Columbia River, we begin with a brief overview of those laws, before proceeding with a summary of the initiative petition itself and the parties' contentions concerning the Attorney General's certified ballot title.

The laws that govern fishing in the Columbia River include an interstate compact between Oregon and Washington, Oregon statutes and administrative rules, Washington statutes and administrative rules, federal law, and treaties with Native American tribes. Also, as a result of more than 50 years of litigation over the lawfulness of various Columbia River fishing practices and policies, the federal courts have issued several orders designed to manage the fisheries in accordance with those laws and regulations.

Under the terms of the Columbia River Compact (the Compact), Oregon and Washington have "concurrent jurisdiction" over the Columbia River. ORS 507.010.

1

The boundary between the two states is the mid-channel of the river; each state may enforce its own laws on its own side and, if the other state has a similar law, may enforce its law on the other state's side. ORS 186.510-186.520; *State v. Catholic*, 75 Or 367, 383-84, 147 P 372 (1915).

The state laws that govern commercial fishing in the Columbia River are numerous. Gillnet fishing is essentially the only method of commercial salmon or sturgeon fishing currently allowed by the law of either state. ORS 508.775; OAR 635-042-0010(2)(b); RCW 77.65.160. "Gillnets" are nets with uniformly sized mesh, weighted at the bottom, so that they float in the water and drift with the tide or current. Fish that are smaller than the mesh pass through, while larger fish get stuck in the mesh around their gills. "Tangle nets" are similarly constructed to cause parts of the head or teeth of the fish to become ensnared in the mesh. "Seines" are nets that are also weighted so that they hang vertically, but they have smaller mesh and are generally used to encircle an entire school of fish and are drawn closed around the school, catching everything inside. The use of seines has been illegal in Oregon since 1948, when the voters adopted an initiative banning their use. ORS 509.216 (current statute banning use).

Commercial fishing for salmon by boat in the Oregon portion of the Columbia River requires a vessel permit from the Oregon Fish and Wildlife Commission. ORS 508.775. No more than 200 permits may be issued each year. ORS 508.792. Generally, all current permit holders may renew their permits every year. If a permit holder is denied renewal, ORS 508.796 provides a method of judicial review. If fewer than 200 permit holders renew their permits, the Oregon Department of Fish and Wildlife

2

(ODFW) may hold a lottery to assign the remaining permits to interested applicants. ORS 508.792.

Native American rights to fish in the Columbia River were preserved by treaty, and those rights are subject to only limited state regulation; that is, the law allows certain time and manner restrictions for conservation purposes similar to those imposed on other nontribal fisheries. *Puyallup Tribe v. Dept. of Game*, 391 US 392, 399, 88 S Ct 1725, 20 L Ed 2d 689 (1968). The United States District Court for the District of Oregon retains continuing jurisdiction over agreements to enforce those treaty rights. *Sohappy v. Smith*, 302 F Supp 899, 911 (D Or 1969) (*U.S. v. Oregon*). The federal district court approved the most recent management plan in August 2008 (commonly known as "the *U.S. v. Oregon* agreement"). As part of the *U.S. v. Oregon* agreement, the states of Washington, Oregon, and Idaho; the federal government; and four Native American tribes agreed to extensive rules governing fisheries and the harvest of fish in the Columbia River.

Federal law also affects commercial fishing in the Columbia River. As relevant to this petition, the Endangered Species Act regulates the harvesting of some threatened salmonid species. 50 CFR §§ 223.102, 223.203 (2011).

Initiative Petition 21 is a seven-page measure comprising 15 sections that, if adopted, would amend a variety of Oregon statutes that address the harvest and sale of salmon from the Oregon side of the Columbia River.

Section 1 enumerates a series of findings concerning the current state of the

Columbia River wild salmon and steelhead runs. Those findings recite that the commercial use of gillnets and tangle nets has resulted in the dramatic decline of fish populations, that gillnets have been banned in other states because of their destructive and nonselective nature, that practices other than gillnetting exist by which hatchery fish may be selectively harvested, that transitioning from gillnetting to alternative practices will better protect endangered salmon and steelhead, and that transitioning to such alternative practices will restore critical habitats and improve hydroelectric dam operations.

Section 2 would amend ORS 508.775 to ban completely the use of gillnet or tangle nets "to take salmon, steelhead, or other fish in the inland waters of the state of Oregon." Additionally, section 2 would prohibit any "wholesaler, canner or buyer" from buying salmon that has been taken "by a gillnet or tangle net from the inland waters of the state of Oregon." Also, section 2 provides an exemption to both of those provisions for persons fishing pursuant to tribal fishing rights.

Section 3 would amend ORS 509.216, which currently bans the use of seine nets. Under section 3, ODFW "shall * * * permit the use of seines for the taking of salmon for commercial purposes" to persons who hold a vessel permit on the effective date of Initiative Petition 21. Also, ODFW "may" permit fixed fishing gear for commercial salmon fishing as well. ODFW may issue one net permit for each existing vessel permit; net permits would be renewable each year and transferrable. Section 3 also requires the commission to give "due consideration to ensuring" that fishing nets and gear are "designed and used to minimize the mortality" of nontarget fish (like wild salmon and steelhead). Last, section 3 provides, in part, that

4

"(8) In adopting commercial fisheries authorized under this section, the Commission shall:

"(a) Comply with the terms of Columbia River fisheries management agreements between the United States, Indian tribes and states [*i.e.*, the *U.S. v. Oregon* agreement].

"(b) Ensure that the percentages of the total state, non-tribal Columbia River salmon harvests, including off channel fishery enhancement areas, that are landed in recreational fisheries in the Columbia River and its tributaries are not reduced below the averages of the 2007-2011 fisheries."

Section 4 similarly provides that "[t]his 2012 Act does not affect * * * [t]he Columbia River Compact or fishing management agreements between the United States, Indian tribes and states [or] * * * [a]ny tribal fishing rights[.]"

Section 5 lists several new definitions, including a definition of Oregon's "[i]nland waters" as, essentially, the entire Columbia River along Oregon's northern border (recall that the Compact says that the border is the middle of the river).

Section 6 would remove representatives of the Columbia River gillnet salmon fishing industry from the commission permit board. Sections 7 through 13 would change various internal references. Section 14 would repeal eight statutes, to be replaced by the procedures provided under sections 1 through 13. It also would repeal ORS 508.460, which provides that "[a]ll gillnet licenses issued by the States of Oregon and Washington are valid as to the waters of the Columbia River in Oregon and Washington[.]" Section 15 sets an operative date of July 1, 2013.

The Attorney General certified the following ballot title for Initiative Petition 21:

5

**"Specified commercial non-tribal fishing methods/procedures changed; recreational salmon fishers ensured minimum share of catch**

"**Result of 'Yes' Vote:** 'Yes' vote changes commercial non-tribal fishing in Oregon 'inland waters' (defined) by banning gillnets, adopting other regulatory changes; recreational salmon fishers ensured their recent share.

"**Result of 'No' Vote:** 'No' vote continues current commercial fishing practices, retains laws allowing gillnets, leaves other current regulations in place; continues annual adjustment of recreational salmon harvest share.

"**Summary:** Current law allows Columbia River commercial salmon fishing with gillnets; requires annual adjustment of recreational salmon fishers' percentage share of overall catch; allows issuing of gillnet permits within limit of 200; recognizes gillnet licenses as valid in Columbia River in both Oregon/Washington. Measure bans non-tribal gillnet fishing in Oregon 'inland waters' (defined); permits use of 'seine nets' (defined) instead; ensures that recreational salmon fishers' percentage of overall catch remains at 2007-2011 levels; prohibits purchase of salmon caught by gillnet by non-tribal fishers in Oregon inland waters; prohibits issuing additional gillnet permits; no longer recognizes validity of gillnet licenses in Oregon and Washington. Measure may affect Columbia River Compact, tribal fishing rights, and fishing management agreements between federal government, tribes, and states. Other provisions."

Four sets of petitioners filed petitions challenging the Attorney General's certified ballot title: (1) Girod, Monroe, and Schamp, who are the chief petitioners of Initiative Petition 21; (2) Cary Johnson, a commercial fisherman; (3) Hobart Kytr, administrator of "Salmon for All," a commercial fishing trade association; and (4) Steven Fick, a fish processor. We have also received a brief *amicus curiae* from the Columbia River Inter-Tribal Fish Commission. Between them, they advance a host of arguments asserting various inadequacies of the ballot title. We reject all but two of those arguments without discussion.

6

The first of the two arguments that require discussion pertains to the caption. The chief petitioners argue that the caption, as certified, "does not express the principal change that the measure proposes: to ban commercial fishing with gillnets in the Columbia River." According to the chief petitioners, the Attorney General "appears to be trying to capture as many concepts as possible within the caption, but that effort results in information that is too general to aid voters." The Attorney General responds that there are too many effects of Initiative Petition 21 to single out one -- the ban on gillnetting -- for mention in the caption and that mentioning only that the measure concerns "specified * * * methods/procedures" of fishing is adequate to inform the voters about the subject of the measure.

ORS 250.035(2)(a) requires the Attorney General to draft a 15-word caption that "reasonably identifies the subject matter of the state measure." The "subject matter" of a measure refers to "the 'actual major effect' of a measure or, if the measure has more than one major effect, all such effects (to the limit of the available words)." *Whitsett v. Kroger*, 348 Or 243, 247, 230 P3d 545 (2010). To identify the "actual major effect" of a measure, this court looks to "the text of the proposed measure to determine the changes that the proposed measure would enact in the context of existing law" and then evaluates whether the caption "reasonably identifies those effects." *Rasmussen v. Kroger*, 350 Or 281, 285, 253 P3d 1031 (2011).

A caption may describe accurately the actual major effect of a measure and still not comply with the requirements of the statute if the description is "too vague and gives voters no clear picture of what is at stake." *Hunnicutt/Stacey v. Myers*, 343 Or 387,

7

391, 171 P3d 349 (2007). In *Novick v. Myers*, 330 Or 351, 7 P3d 518 (2000), for example, the proposed initiative measure would have imposed different dollar limitations on campaign contributions by different classes of contributors. The ballot title that the Attorney General had certified, however, merely stated that the measure "limits certain campaign contributions." *Id*. at 354. This court concluded that the caption failed to convey the crux of the measure, which was to create a system of different contribution limits for different classes of contributors: "The word 'certain' in the Attorney General's caption fails to identify that significant characteristic of the subject matter of the proposed measure." *Id.* at 356.

The Attorney General's certified ballot title caption in this case suffers from a similar deficiency. It simply states that the measure would change unspecified "fishing methods/procedures," when the actual subject of the measure is the prohibition of the only method that current law allows -- namely, gillnetting -- and the authorization of seine or fixed gear fishing in its place. As we have noted, the findings in the measure all speak of the asserted deleterious consequences of gillnetting and of the need to move to more selective fishing practices; no other subject is mentioned. The measure then states a ban on gillnetting in the Columbia River, along with a concomitant ban on wholesale purchasing of fish caught by gillnetting. As well, it provides that the ban on gillnetting does not apply to tribal fishing. It authorizes the State Fish and Wildlife Commission to adopt rules allowing the use of seines and fixed fishing gear as an alternative to gillnetting, prohibits the issuance of gillnet vessel licenses, and requires the removal of representatives of the gillnet fishing industry from the commission permit board. Other,

8

subsidiary effects certainly may be described, but each flows from the central effect of the measure, which is the ban on gillnetting and the authorization of seine or fixed gear fishing in its place. We conclude that the caption, which fails to mention the actual major effect of the measure, fails to substantially comply with the requirements of ORS 250.035(2)(a). As a result, the ballot title must be referred to the Attorney General for modification.

The second of the two arguments that requires discussion in this opinion pertains to the summary of the measure. The chief petitioners argue that the summary is deficient because it inaccurately states that Initiative Petition 21 "may affect Columbia River Compact, tribal fishing rights, and fishing management agreements between federal government, tribes, and states." They assert that the Attorney General has improperly speculated about situations that *might* cause a conflict between Initiative Petition 21 and other sources of law regarding the use of the Columbia River. Moreover, the chief petitioners observe, the summary conflicts with section 4 of Initiative Petition 21, which provides that "[t]his 2012 Act *does not* affect" the Compact, the *U.S. v. Oregon* agreement, or tribal fishing rights. (Emphasis added.)

Johnson takes the opposite position with respect to the portion of the summary that refers to the potential conflicts between Initiative Petition 21 and other sources of law. He argues that the summary fails to substantially comply with ORS 250.035(2)(d) because the Attorney General did not go far enough in describing what he asserts is a direct and irreconcilable conflict between Initiative Petition 21 and the Compact. In a similar vein, the Columbia River Inter-Tribal Fish Commission agrees

with Johnson, asserting that "the proposed initiative's change to Oregon's fishery management obligations is at odds with the language of the Compact." It does not explain, however, why Initiative Petition 21 would be inconsistent with the Compact.

The Attorney General responds that, as evidenced by the conflicting arguments set out by the chief petitioners, Johnson, and the commission, whether Initiative Petition 21 will have an effect on the Compact, tribal fishing rights, and the *U.S. v. Oregon* agreement is a disputed matter. The Attorney General argues that the challenged phrase simply acknowledges the conflicting readings of Initiative Petition 21 and that the outcome of any future legal challenge regarding the potential conflict is unknown. The Attorney General concludes that it was appropriate, and not speculative, to point out to voters the possibility of a conflict with other important laws.

ORS 250.035(2)(d) provides that a ballot title summary be "[a] concise and impartial statement of not more than 125 words summarizing the state measure and its major effect." The function of the summary is "to provide voters with enough information to understand what will happen if the measure is approved." *Caruthers v. Kroger*, 347 Or 660, 670, 227 P3d 723 (2010). That information may include a description of the effect of the measure at issue on other laws, so long as the description is accurate. *Berman v. Kroger*, 347 Or 509, 514, 225 P3d 32 (2009). In all events, the information must pertain to an identified, actual "effect" of enacting the measure; it is not permissible to "speculate about the *possible* effects of a proposed measure." *Pelikan/Tauman v. Myers*, 342 Or 383, 389, 153 P3d 117 (2007) (emphasis added); *see also Kain v. Myers (S49089)*, 333 Or 446, 450-51, 41 P3d 416 (2002) (ballot title need

10

not mention "conditional and conjectural" effects of proposed measure).

In this case, the summary that the Attorney General certified runs afoul of that latter principle. In stating that the measure "may affect Columbia River Compact, tribal fishing rights, and fishing management agreements," it merely speculates that there is a possibility that the measure may affect the various laws and agreements listed in entirely unspecified ways. A possibility that enactment of a measure may produce unspecified consequences is not an "effect" within the meaning of ORS 250.035(2)(d). The summary therefore does not substantially comply with the statutory requirement to state the "effect" of the measure, and, for that additional reason, the ballot title must be referred to the Attorney General for modification.

The ballot title is referred to the Attorney General for modification.